# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7309 | **DATE** | 9/11/2002 |
| **CASE TITLE** | Northwestern University vs. The City of Evanston | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing re-set for 10/3/2002 at 10:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order: The City's motion for summary judgment(46-1) is granted with respect to Counts II, III, IV, and VI and denied with respect to Counts I and V.  The status hearing set for 9/12/02 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | **SEP 12 2002** | |
| | Notified counsel by telephone. | | | date docketed | **88** |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | 9/11/2002 | |
| | | | | date mailed notice | |
| GL | courtroom deputy's initials | | | GL | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# UNITED STATES DISTRICT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NORTHWESTERN UNIVERSITY,   )
             )
    Plaintiff,     )
             )
   v.        )  No. 00 C 7309
             )
THE CITY OF EVANSTON,   )
             )
    Defendant.   )



## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Judge:

  Plaintiff Northwestern University ("Northwestern" or "University") alleges that the City of Evanston ("Evanston" or "City") designed and enacted an historic preservation district which wrongfully encompassed numerous University properties. Northwestern sued Evanston pursuant to 42 U.S.C. § 1983, claiming the City's action imposed an unconstitutional condition on the University and violated its rights to equal protection, due process, and freedom of speech. Presently before us is the City's motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

  Northwestern currently owns approximately 240 acres of land in Evanston. Under the terms of a charter ("Charter") granted by the State of Illinois in 1851 and amended in 1855, this land is exempt from property taxation.[2] Northwestern claims that its exemption from property taxation has

---

[1] The following facts, unless otherwise specified, are taken from the City's answer (Ans.) and the parties' statements of undisputed material facts (SMF) required by Local Rule 56.1.

[2] Illinois law also exempts all non-profit educational institutions from taxation on property used for school purposes. *See* 35 ILCS 200/15-30.

fueled a long-running dispute with Evanston – Evanston believes Northwestern should make voluntary financial contributions to offset the cost of services provided by the City, but the University has refused to make such contributions. Northwestern alleges this dispute led the City to include two large parcels of land containing numerous University properties in an historic preservation district in an effort to pressure the University to make such contributions.

The effort to create an historic preservation district in Evanston began in 1997 when an ad hoc citizens' group, the Northeast Evanston Historic District Association ("NEHDA"), proposed the designation of a portion of land in the northeast section of the City as a National Historic District ("National District"). Among the properties included in the National District were 26 University properties located within the T1 Transitional Campus District ("T1 District"). The National District, however, did not include any University property within the T2 Transitional Campus District ("T2 District").[3] Although the creation of the National District did not place any restrictions on University property, Northwestern objected to the inclusion of its T1 District properties within the National District. Despite Northwestern's objections, the Evanston Preservation Commission ("Preservation Commission") and the Illinois Historic Preservation Agency recommended approval of the National District, and on August 12, 1999, the United States Department of Interior approved the National District and listed it on the National Register of Historic Places.

NEHDA next sought the designation of a local historic district under the City's Preservation Ordinance ("Preservation Ordinance"). On October 19, 1999, NEHDA submitted its proposed local

---

[3] The T1 District is adjacent to a residential neighborhood running along Orrington Avenue. The University properties within the T1 District contain structures originally built as single-family residences but which are now mostly used as offices or research facilities. The T2 District is largely separated from the Orrington Avenue residential neighborhood by the T1 District. The University properties within the T2 District contain some structures originally built as single-family residences as well as larger, institutional structures ("Institutional Structures") such as the Blomquist Recreation Center, the Transportation Center, the Foster-Walker Undergraduate Housing Complex, and Searle Hall.

historic district ("Proposed Local District") to the Preservation Commission. The Proposed Local District expanded the boundaries of the National District, including (among other properties) 22 additional University tracts located within the T2 District.[4] Property located within a local historic district requires a Certificate of Appropriateness ("COA") from the Preservation Commission prior to the commencement of any exterior alteration, construction, demolition, or relocation of affected properties.[5] Fearing hindrance of its ability to develop its property, Northwestern objected to the inclusion of its T1 and T2 District property in the Proposed Local District.

The Preservation Commission conducted public hearings on the Proposed Local District, and University officials were present at most, if not all, of the hearings. On January 13, 2000, Northwestern submitted its objections to the inclusion of its properties within the Proposed Local District in a five-page letter to Preservation Commission Chairwoman Jessica Deis and attached a 38-page written report in opposition to the Proposed Local District prepared by an architectural expert. Over these objections, the Preservation Commission submitted a report to the City Council recommending the adoption of the Proposed Local District.

Following this recommendation, the City Council's Planning and Development Committee ("Committee") also held public hearings on the Proposed Local District. The University again

---

[4] As noted earlier, NEHDA excluded these T2 District properties from the National District. NEHDA claimed it excluded these properties because "the National Register does not allow the inclusion of discontiguous [sic] properties . . . . and [the T2 District properties] were separated from the main body of the district by parking lots or other non-residential uses." Def. Ex. 40 (NEHDA's Proposed Local District Nomination). The Preservation Ordinance, on the other hand, does not restrict the inclusion of non-contiguous properties in local historic districts.

[5] Prior to the local historic district at issue in this case, Northwestern owned 33 properties containing 37 structures which were subject to the Preservation Ordinance. Def. SMF ¶ 14. Since 1994, the Preservation Commission has approved at least seven University requests for a COA. Pl. Resp. to Def. SMF ¶ 18. Northwestern maintains that these requests were for only "minor modifications" such as window replacements, and that in two of these cases the Preservation Commission review process was "difficult" or "lengthy." *Id.*

submitted its written objections to the Proposed Local District in a letter dated April 12, 2000. *See* Pl. Ex. 208. Eugene Sunshine, Northwestern's Senior Vice President for Business and Finance, personally met with seven of the nine aldermen to express the University's opposition to the Proposed Local District. Nonetheless, on April 24, 2000, the Committee submitted to the full City Council a draft ordinance approving the Proposed Local District.

Although the City Council was scheduled to consider the Proposed Local District on May 8, 2000, it returned the proposal to the Committee for consideration of potential boundary changes. Two modifications to the Proposed Local District were subsequently made. The first modification occurred on May 18, 2000 when the Committee moved the northern boundary south to Lincoln Street. This removed a substantial amount of property owned by residents purportedly opposed to the Proposed Local District, *see* Compl. Ex. F, and it also removed 7.05 acres of University property which was not part of the T1 or T2 Districts.[6] The second modification occurred when the City Council met to consider passage of the revised Proposed Local District on May 22, 2000. Prior to consideration, Alderman Stephen Engelman proposed an amendment, subsequently approved, which removed thirteen additional properties south of Lincoln Street (the so-called "Lincoln 13") from the Proposed Local District, twelve[7] of which contained "contributing" structures[8] and none of which were owned by the University.

---

[6] Northwestern's T1 and T2 District property is all south of Lincoln Street and was not affected by this revision of the Proposed Local District. *See* Compl. Ex. A, G.

[7] The remaining property is a vacant lot.

[8] Under the Preservation Ordinance, a property or structure within a district has "contributing significance" to the local district if "it contributes generally to the qualities that give the district historic, cultural, architectural or archaeological significance as embodied in the criteria for designating the district." Def. Ex. 36. The Preservation Ordinance defines as "non-contributing" those properties or structures which are "not a representation of the qualities that give the district historic, cultural, architectural or archaeological significance as embodied in the criteria for designating the district." Def. Ex. 36.

After these modifications, the City Council passed the ordinance ("Designation Ordinance") adopting the local historic district ("Final Local District") by a 6-3 vote. Aldermen Arthur Newman, Steven Bernstein, Gene Feldman, Ann Rainey, Joseph Kent, and Melissa Wynne voted for the Designation Ordinance, while Aldermen Stephen Engelman, Dennis Drummer, and Edmund Moran voted against it. Mayor Lorraine Morton then vetoed the Designation Ordinance, but the City Council overrode her veto by an identical 6-3 vote.

Northwestern then filed this lawsuit against the City pursuant to 42 U.S.C. § 1983, alleging that the City's action violated a number of the University's constitutional rights. Count I of the Amended Complaint[9] alleges the Designation Ordinance violated Northwestern's right to equal protection because it was motivated by illegitimate animus toward the University. Count II alleges the City treated Northwestern differently than similarly-situated parties for no rational reason and thereby violated the University's right to equal protection. Count III alleges the City's action was arbitrary, capricious, and irrational and thereby violated Northwestern's right to substantive due process. Count IV alleges the City violated Northwestern's right to procedural due process by failing to conduct hearings on modifications to the Proposed Local District. Count V alleges the City imposed an unconstitutional condition on the University's right, guaranteed under its Charter, to be free from property taxation. Count VI alleges the Designation Ordinance violated Northwestern's First Amendment right to conduct expressive activities on its property located within the Final Local District. The City has moved for summary judgment on each of these counts.

---

[9] Northwestern, which filed its original complaint on ____, submitted an amended complaint on _____.

DISCUSSION

## I. Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations and internal quotations omitted). Once the moving party has met this burden of production, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, "we must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Nelson v. Sandoz Pharmaceuticals Corp.*, 288 F.3d 954, 962 (7th Cir. 2002).

## II. Equal Protection

In Count I, Northwestern alleges the City violated its right to equal protection by vindictively including University property in the Final Local District in retaliation for the University's refusal to make financial contributions to the City. In Count II, Northwestern maintains the City violated its right to equal protection by including University property but excluding property of similarly-situated parties in a manner that was not rationally related to any legitimate government interest. We find the City is entitled to summary judgment on Count II, but Northwestern has established genuine issues of material fact which preclude summary judgment on Count I.

Before addressing these counts, we briefly address recent confusion over the standards governing so-called "class of one" equal protection claims, that is, equal protection claims brought by a single individual rather than a class of similarly-situated parties. In *Village of Willowbrook v. Olech*, 160 F.3d 386 (7th Cir. 1998), a married couple alleged that city officials, in retaliation for a lawsuit they had won against the city, demanded a 33-foot easement before connecting their home to the city water supply, while requiring only 15-foot easements from other similarly-situated homeowners. The Seventh Circuit held that the plaintiffs had stated a "vindictive action" equal protection claim, but noted that such cases "require[ ] proof that the cause of the differential treatment . . . was a totally illegitimate animus toward the plaintiff by the defendant." *Id.* at 388. The Supreme Court affirmed, but on different grounds – the Court held that plaintiffs' "allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection standards," and refused to reach "the alternative theory of 'subjective ill will' relied on" by the Seventh Circuit. *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000). Thus, the Supreme Court indicated that an equal protection plaintiff may proceed as a class of one if it alleges that it was intentionally treated differently than other similarly-situated parties and that no rational basis existed for the differential treatment. *Id.* at 564.

The Seventh Circuit, however, citing ambiguous language in the Supreme Court's opinion and the danger of involving the federal courts in the enforcement of "petty" state and local laws, announced in a subsequent case that it would continue to "gloss 'no rational basis' in the unusual setting of 'class of one' equal protection cases to mean that to make out a prima facie case the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's

position." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000). Despite this clear statement, subsequent opinions in the Seventh Circuit have inconsistently identified the standards governing class of one equal protection claims.[10] For example, in *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002), the Seventh Circuit, citing *Hilton*, required the plaintiff in a class of one case to prove that the differential treatment was motivated by subjective ill will. In *Nevel v. Village of Schaumburg*, No. 01-1966, 2002 WL 1729524, at *1 (7th Cir. July 26, 2002), though, the Seventh Circuit held that to succeed under a class of one equal protection theory, plaintiffs "must show that they were (1) intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment *or* (2) that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Id.* (emphasis added) (internal quotations omitted) (citing *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001)). While *Purze* suggests a class of one plaintiff can only bring a vindictive action equal protection claim, *Nevel* indicates a class of one plaintiff can pursue both a vindictive action equal protection claim *and* a traditional equal protection claim.

We believe that *Nevel*, the Seventh Circuit's most recent opinion on this subject, states the proper standards governing class of one equal protection claims. *Nevel* is more faithful to the Supreme Court's decision in *Olech* – it incorporates both the traditional equal protection standard endorsed by the Supreme Court and the vindictive action equal protection standard recognized by the Seventh Circuit. The Seventh Circuit's subsequent attempts in *Hilton* and *Purze* to narrow the range of options available to class of one equal protection plaintiffs simply cannot be squared with *Olech*.

---

[10] *See* the Court's reasoning in *Olech v. Village of Willowbrook*, No. 97-C-4935, 2002 WL 1058843, at *14-16 (N.D.Ill. May 24, 2002).

Thus, Northwestern may proceed as a class of one under both the traditional and vindictive action equal protection standards.

### B. Traditional Equal Protection

In Count II, Northwestern alleges the City violated traditional equal protection standards by manipulating the boundaries of the historic district in such a way that University property was included but the property of other similarly-situated owners was excluded. To establish a traditional equal protection violation, Northwestern must show that the City intentionally treated it differently than other similarly-situated parties and that no rational basis existed for the differential treatment. *Olech*, 528 U.S. at 564. Since the Designation Ordinance neither involves fundamental rights nor classifies property along suspect lines, it must only pass the "deferential rational basis test." *Martin v. Shawno-Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir. 2002). As the party challenging the ordinance, Northwestern bears the burden of showing that there is no rational relationship between the boundaries established by the measure and some legitimate governmental objective. *See Heller v. Doe*, 509 U.S. 312, 320 (1993). To prevail, Northwestern "must surmount the presumption of rationality in the city's ordinances." *Hager v. City of West Peoria*, 84 F.3d 865, 872 (7th Cir. 1996). Because Northwestern has failed to offer sufficient evidence to rebut this presumption, the City is entitled to summary judgment on this count.

Northwestern claims the City cannot offer any rational justification for its decision to exclude certain property owned by those who objected to their inclusion in the historic district but not to exclude property owned by the University. Northwestern points in particular to two modifications to the Proposed Local District: (1) the City moved the northern boundary of the Proposed Local District south to Lincoln Street, excluding more than 500 properties from the district, and (2) the City excluded thirteen adjacent properties located south of Lincoln Street (the Lincoln 13) after the

property owners unanimously objected to their inclusion. *See* Am. Compl. ¶¶ 95-96; Pl. SMF ¶¶ 330-31, 348-53. Northwestern, which also objected to inclusion, maintains that its property should have been excluded from the historic district as well.

With respect to the City's first modification, Northwestern's claim is not viable. Northwestern alleges that the owners of more than 300 properties north of Lincoln Street signed a petition opposing their inclusion in the historic district and that the City subsequently excluded all property north of Lincoln Street. *See* Am. Compl. ¶ 95. In so doing, however, the City also excluded 7.05 acres of University property located north of Lincoln Street. Def. SMF ¶ 121. Thus, Northwestern cannot complain of differential treatment with respect to this decision because it was not in fact treated differently than other similarly-situated property owners – like other objecting property owners north of Lincoln Street, its property in that area was excluded from the Final Local District.

With respect to the City's second modification, Northwestern has failed to provide sufficient evidence to prevail. The City's decision to exclude the Lincoln 13 is easily explainable – when a small, organized block of adjacent landowners opposes a zoning change, the block often gets its way.[11] The fact that the City's only justification for removing the Lincoln 13 was their opposition to inclusion does not make the resulting boundary irrational, at least in the constitutional sense of the word, for "[t]he opinion of area residents concerning neighborhood preservation is an appropriate factor for consideration in zoning decisions." *Nelson v. City of Selma*, 881 F.2d 836, 840 (9th Cir. 1989). Nonetheless, Northwestern complains that if opposition to inclusion explains the removal of the Lincoln 13, its property south of Lincoln Street should also have been removed.

---

[11] *See generally* Mancur Olson, *The Logic of Collective Action: Public Goods and the Theory of Groups* 28-29 (1971) (arguing that group size is inversely related to successful collective action).

The City, however, offers several plausible justifications for its decision not to remove University property, only one of which we need address here – the City suggests there is a greater need for the protections secured by the Preservation Ordinance south of Lincoln Street, noting in particular the danger posed by potential further University expansion in residential neighborhoods west of Sheridan Road.[12] *See* Mem. in Support at 31-32. This alone provides a rational basis for the City's decision to exclude the Lincoln 13 but not University property – the control of institutional expansion is a legitimate government objective, *see Cohen v. City of Des Plaines*, 8 F.3d 484, 494 (7th Cir. 1993) (holding that "[a] city may use zoning regulations as an exercise of the police power to protect residents from the ill effects of urbanization, such as crowding, encroachment of commercial business or industries, traffic congestion, and noise"), and the Designation Ordinance, which prevents demolition and construction without approval from the Commission, is rationally related to this legitimate objective.

Of course, this justification implies Northwestern was, as it alleges, the "target" of the ordinance. That Northwestern may have been the target of legislation, however, does not violate its right to equal protection. In *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana*, 57 F.3d 505

---

[12] Northwestern argues that this rationale "can be refuted by the University's authorized and long-standing presence in the T1 and T2 Districts, and the City's inclusion of Institutional Structures which are already west of Sheridan Road, inherently institutional, and not single-family residential structures . . . . If the City wanted to preserve the homes on Orrington Avenue, it could have imposed the Final Local District only on those properties rather than burdening the University's properties." Mem. in Opp'n at 53. The fact that Northwestern already owns property in the T1 and T2 Districts, however, does not explain away the City's concerns. The City fears two forms of potential institutional expansion: (1) Northwestern may purchase more single-family residences in the T1 and T2 Districts and convert these properties to institutional uses, and (2) Northwestern may demolish the single-family residences that it owns or in the future purchases and construct larger buildings. These are both plausible concerns. Of course, as Northwestern points out, the City could have addressed these concerns by designing a non-contiguous historic district, including in the Final Local District only those structures originally built as single-family residences and excluding the University's Institutional Structures. However, while the Preservation Ordinance does permit the City to construct non-contiguous historic districts, it does not *require* the City to do so, and the City could have reasonably believed that it was simply easier to design and publicize a contiguous historic district.

(7th Cir. 1995), the county board, after learning that Pro-Eco was preparing to develop a landfill, adopted an ordinance banning landfills within the county. Pro-Eco sued, arguing the ordinance violated its right to equal protection by singling it out for unfair treatment. The Seventh Circuit rejected the claim, drawing a sharp distinction between cases involving "enforcement" and "enactment." *Id.* at 515 ("Pro-Eco does not present us with a case of enforcement; it presents us with a case of enactment"). With respect to unequal enforcement, the court acknowledged that an "ordinance generally applicable on its face but enforced for no legitimate reason against only an individual or a particular class may violate the Equal Protection Clause." *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) and *Esmail v. Macrane*, 53 F.3d 176, 179-80 (7th Cir. 1995)). With respect to unequal enactment, however, the court explained that "legislatures may enact generally applicable legislation as a prophylactic to the danger posed by one particular actor as long as the end of the legislation is legitimate and . . . the means are rationally related to the ends."[13] *Id.* Like the county ordinance in *Pro-Eco,* the City's Designation Ordinance, although motivated by concern over one particular actor, is generally applicable legislation which is rationally related to a legitimate government objective. As such, it does not violate the Equal Protection Clause.

Northwestern contends, though, that the City's institutional expansion argument is mere pretext for its real motivation – the extortion of funds from the University. The Supreme Court, however, has generally eschewed inquiry into a legislature's subjective motivations in traditional

---

[13] The court did acknowledge that "an ordinance may contain language of general applicability and still violate the Equal Protection Clause without a showing of unfair enforcement." *Pro-Eco*, 57 F.3d at 515 n.11. The court suggested that "where 1) the language of the statute, while not identifying any individual by name, could apply only to one person, and 2) such a classification would not rationally relate to a legitimate governmental end," the legislation would essentially amount to an unconstitutional bill of attainder. *Id.* (citing *Falls v. Town of Dyer, Ind.*, 875 F.2d 146 (7th Cir. 1989)). In the present case, however, the language of the Designation Ordinance does not apply to Northwestern alone – many other property owners are included in the Final Local District it established – so the University may not take advantage of this exception.

equal protection cases.[14] *See FCC v. Beach Communications*, 508 U.S. 307, 315 (1993) (noting that "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"). Thus, the City need not show that its *actual* motivation for the modifications was rational. *See id.* at 315 (noting that "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"). Instead, the City must simply offer a hypothetical and "reasonably conceivable state of facts that could provide a rational basis for the [modifications]." *Id.* at 313. This the City has done. Accordingly, the City is entitled to summary judgment on Count II.

### C. Vindictive Action Equal Protection

In Count I, Northwestern claims the City violated vindictive action equal protection standards by intentionally targeting University property for inclusion in the Final Local District because of an illegitimate animus toward the University, animus stemming from frustration with Northwestern's property-tax exemption and attendant refusal to make voluntary contributions for the provision of City services. To establish a vindictive action equal protection claim, "the plaintiff must demonstrate that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a 'totally illegitimate animus toward the plaintiff by the defendant.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Olech*, 160 F.3d at 388) (internal citations omitted). A vindictive action equal protection claim, unlike its traditional counterpart, requires scrutiny of the legislature's actual subjective motivation. We find there are genuine issues of material fact as to the City's motive in designing the Final Local District which preclude summary judgment on this count.

---

[14] An exception to this rule exists where the "subjective motivation was purposefully to discriminate along lines that would warrant heightened scrutiny." *Women Involved in Farm Economics v. United States Dept. of Agric.*, 876 F.2d 994, 1005 n.8 (D.C. Cir. 1989).

The City advances several arguments for summary judgment. First, the City offers evidence suggesting Northwestern was not singled out for differential treatment, an essential element of a vindictive action equal protection claim. For example, the City maintains that Northwestern owns only 56 of the 375 structures and approximately 21% of the acreage included in the Final Local District.[15] While Northwestern is not the only property owner affected by the Designation Ordinance, it has offered prima facie evidence that its property, unlike that of others, was specifically targeted for inclusion in the Final Local District. In particular, the late amendment which added the University's T2 District properties (most of which were non-contributing Institutional Structures) to the Final Local District raises serious questions about the City's motive.[16]

Second, the City argues that any animus it may have toward Northwestern University is not in fact illegitimate. The City suggests it is perfectly rational to harbor animus for an institution which fails to pay for the provision of City services and which threatens to encroach on existing residential neighborhoods. While the City's frustration with the University is understandable, animus against an entity which is merely exercising a right under its charter to be free from property taxation simply cannot be described as legitimate.

---

[15] Northwestern claims to own 62 structures and at least 30% of the acreage in the Final Local District. *See* Pl. Resp. to Def. SMF ¶ 68; Pl. SMF ¶ 375.

[16] Although this amendment also added non-University property to the Final Local District, this fact alone does not establish that Northwestern was not singled out for differential treatment. If the amendment would not have passed but for the inclusion of Northwestern's T2 properties, then some University property was in effect singled out for inclusion in the Final Local District.

Third, the City contends illegitimate animus is not the sole cause of the differential treatment, citing numerous other possible motivations for the Designation Ordinance.[17] Northwestern, however, has presented sufficient evidence to meet its burden of production on this issue. In particular, a reasonable jury could find that the sole cause of the late amendment which added Northwestern's T2 District properties to the Final Local District was the City's animus toward the University.

Finally, the City maintains that to establish municipal liability under § 1983, Northwestern must prove that a majority of the members of the City Council supported the Designation Ordinance based on an illegitimate motive. Although there is certainly evidence that some aldermen harbored ill will toward the University, the City contends Northwestern has not shown that the council *as a whole* acted out of illegitimate animus. Since Northwestern has offered evidence of discriminatory intent with respect to only four of the nine Council members,[18] the City claims it is entitled to summary judgment.

Northwestern insists it need only show that a "significant bloc" of aldermen were motivated by discriminatory intent, citing *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds*, 523 U.S. 44 (1998). In that case, the plaintiff charged that she had been terminated by the nine-member city council in retaliation for her exercise of constitutionally protected speech. The plaintiff provided evidence that two members of the council acted with a retaliatory motive. The court acknowledged precedent supporting two competing positions – one line

---

[17] Northwestern suggests that the City's illegitimate animus need only be a "controlling motivation" for it to prevail. *See* Mem. in Opp'n at 29-30. This position, however, conflicts with the plain language of *Albiero*, in which the Seventh Circuit held that a plaintiff must show that "[i]ll will is the *sole* cause of the complained-of action" to prevail. *Albiero*, 246 F.3d at 932 (emphasis added). Northwestern offers no persuasive reason to disregard this clear rule.

[18] Northwestern acknowledges it offered evidence of illegitimate animus for only four aldermen. *See* Mem. in Opp'n at 48 (arguing that "a significant bloc of aldermen (Newman, Rainey, Bernstein and Feldman) have repeatedly expressed illegitimate animus toward the University").

of precedent indicated that a "plaintiff must adduce evidence sufficient to show that a majority of the members of the legislative body acted from a constitutionally proscribed motive before . . . municipal liability can attach," *id.* at 437 (citing *United States v. City of Yonkers*, 856 F.2d 444, 457-58 (2d Cir. 1988) and *Church v. City of Huntsville*, 30 F.3d 1332, 1343-44 (11th Cir. 1994)), while another line of precedent, "principally in the areas of race and gender discrimination," suggested municipal liability would attach if a plaintiff could offer "evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others." *Scott-Harris*, 134 F.3d at 437-38 (citing *United States v. City of Birmingham*, 538 F.Supp 819, 828 (E.D.Mich. 1982), *aff'd*, 727 F.2d 560 (6th Cir. 1984) and *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221-23 (2d Cir. 1987)). The court held that, even under the more relaxed "significant bloc" approach, the plaintiff's evidence with respect to two of nine council members was insufficient to establish municipal liability.[19]

The question before us, then, is this: what percentage of members of a legislative body must be moved by a constitutionally impermissible motive before the municipality itself may be held liable under § 1983 for the adoption of a facially neutral ordinance? Having been squarely presented this question, we hold that to establish municipal liability based on the discriminatory motive of a multi-member body, the plaintiff must show that a majority of its members acted with discriminatory intent. This position is consistent with both the logic of municipal liability and the weight of precedent. As the *Scott-Harris* court itself recognized, "because a municipal ordinance can become law only by a majority vote of the city council, there is a certain incongruity in allowing fewer than a

---

[19] We note, though, that the court assumed the validity of the "significant bloc" approach without deciding the question. *Scott-Harris*, 134 F.3d at 438 ("we assume for argument's sake (but do not decide) that in a sufficiently compelling case the requirement that the plaintiff prove bad motive on the part of a majority of the members of a legislative body might be relaxed . . . ."). This important detail was somehow omitted from Northwestern's brief. *See* Mem. in Opp'n at 48.

-16-

majority of the council members to subject the city to liability under section 1983." *Scott-Harris*, 134 F.3d at 438. Moreover, the Seventh Circuit itself appears to have endorsed this logic. In *Felton v. Bd. of Comm'rs*, 5 F.3d 198 (7th Cir. 1993), the contract of a Republican county employee was not renewed and a Democrat was hired to replace him after two new Democratic members were elected to the previously all-Republican three-member Board of Commissioners. In upholding a finding of municipal liability for political retaliation, the court emphasized that the evidence established the discriminatory motive of *both* Democratic commissioners, and thereby implicitly acknowledged that the discriminatory motive of one member of a three member panel is insufficient to establish municipal liability. *Id.* at 202 (finding the evidence "sufficient to support the [lower] court's finding that (at least) a majority of the Board was improperly motivated in its decision . . . .").

To prevail on its vindictive action equal protection claim, then, Northwestern must show a majority of the City Council acted solely out of illegitimate animus toward the University. We believe Northwestern has offered sufficient evidence to survive summary judgment on this question. Although Northwestern has presented direct evidence of illegitimate animus with respect to only four of the six aldermen who voted for the Designation Ordinance, *see* Mem. in Opp'n at 48, the motives of the remaining two aldermen remain unclear. Nonetheless, the circumstantial evidence suggests that a reasonable jury could find that these two aldermen were also motivated by illegitimate animus. As such, Northwestern has established genuine issues of material fact which preclude summary judgment on Count I.

III. Due Process

In Count III of the Amended Complaint, Northwestern alleges the City's action was arbitrary, capricious, and irrational and thereby violated its right to substantive due process. In Count IV, Northwestern alleges the City violated its right to procedural due process by failing to conduct

-17-

hearings on modifications to the Proposed Local District. We find the City is entitled to summary judgment on each of these counts.

### A. Substantive Due Process

In Count III, Northwestern claims the Designation Ordinance violates its right to substantive due process. To prevail on this count, Northwestern must show that the City's action was either (a) an infringement of a fundamental liberty interest or (b) "arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Pro-Eco*, 57 F.3d at 514. Northwestern, a duly-authorized corporation under the laws of the State of Illinois, rightly refrains from claiming an infringement of a fundamental right. *See National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995) ("Corporations do not have fundamental rights; they do not have liberty interests, period."). Thus, Northwestern must show the ordinance fails the rational basis test, that is, the ordinance was "arbitrary and unreasonable," or, as the Seventh Circuit interprets this phrase, "invidious or irrational." *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988). Northwestern's burden here is heavy – "'governmental action passes the rational basis test if a sound reason may be hypothesized. The government need not prove the reason to a court's satisfaction.'" *Pro-Eco*, 57 F.3d at 514 (quoting *Northside Sanitary Landfill, Inc. v. City of Indianapolis*, 902 F.2d 521, 522 (7th Cir. 1990)).

Northwestern argues the Designation Ordinance was invidious or irrational because it was designed to extort funds from the University. The City, on the other hand, claims the Designation Ordinance was motivated by several legitimate goals, among them, historic preservation and the protection of the neighborhood from institutional expansion. We need not decide, though, what motivation the City *actually* had in passing the Designation Ordinance. *See id.* (to pass rational basis test, defendant must offer sound hypothetical reason for its action). The City has offered several

plausible reasons for its action which federal courts have recognized as legitimate. *See Penn Cent. Transp. Corp. v. City of New York*, 438 U.S. 104, 129 (1978) ("[the] objective of preserving structures and areas with special historic, architectural, or cultural significance is an entirely permissible governmental goal"); *Cohen*, 8 F.3d at 494 ("[a] city may use zoning regulations as an exercise of the police power to protect residents from the ill effects of urbanization, such as crowding, encroachment of commercial business or industries, traffic congestion, and noise"). Because the Designation Ordinance is rationally related to these objectives, the City is entitled to summary judgment on Count III.

### B. Procedural Due Process

In Count IV, Northwestern claims the process used to design and adopt the Designation Ordinance violated its right to procedural due process. To prevail on this count, Northwestern must show that it was deprived of a protected interest and that this deprivation occurred without appropriate procedural safeguards. *See Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996). We find that the procedures used to draft and adopt the Designation Ordinance complied with due process requirements.[20]

Legislative bodies like the City Council may enact generally applicable laws without granting interested parties a public hearing. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915); *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Ind.*, 57 F.3d 505, 513 (7th Cir. 1995). This is so for two reasons. First, since a generally applicable law "applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." *Bi-Metallic*, 239 U.S. at 445. Second, "the across-the-board character" of a generally applicable law provides a

---

[20] The City argues that Northwestern does not have a protected property interest at stake in this case. Because we find that Northwestern received all the process it was due, we need not reach this issue.

"purely electoral" democratic check on legislative activity. *Coniston*, 844 F.2d at 469. However, when a generally applicable law affects only a small number of people, an individualized hearing may be required. *See Londoner v. City & County of Denver*, 210 U.S. 373 (1908); *Coniston*, 844 F.2d at 469 (suggesting that the small size of a class "might support an argument that some type of individualized hearing was required"). The number of people affected by a law, though, does not determine whether a hearing is required; instead, it is the *nature* of the legislative action that matters. Where a legislative body's action takes on an individualized character, it becomes more "adjudicative" than "legislative" and therefore requires a hearing. *See Bi-Metallic*, 239 U.S. at 446 (suggesting that the right to a hearing depends on whether the parties were "exceptionally affected, in each case upon individual grounds"); *Coniston*, 844 F.2d at 468 (discussing adjudicative-legislative dichotomy). Whether Northwestern was entitled to a hearing thus depends on whether the Designation Ordinance is more properly characterized as generally applicable legislation or an adjudicatory act.

Two Seventh Circuit decisions provide guidance on this question. In *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County*, the plaintiff challenged a county landfill moratorium on procedural due process grounds. *Pro-Eco*, 57 F.3d at 513. The court conceded that the county likely acted as it did "specifically because it saw Pro-Eco's landfill coming." *Id.* Nonetheless, the court rejected the due process claim, suggesting that the plaintiff was not even entitled to a hearing: "We do not believe that a generally applicable prophylactic legislation provoked by the fear of one particular actor converts an elected body's legislative act into a quasi-judicial or administrative act that would require more

process." *Id.* Although dicta,[21] this statement suggests the Designation Ordinance, even if specifically targeted at the University, was a legislative act that did not require a hearing.

The court reached a similar conclusion in *L C & S, Inc. v. Warren County Area Plan Comm'n*, 244 F.3d 601 (7th Cir. 2001). In that case, the county's planning commission, responding to rumors that the plaintiffs were planning to open a topless or gay bar, amended the zoning ordinance without notice, forcing the plaintiffs to seek a special zoning exception for a building they had already leased. After the exception was denied, the plaintiffs sued the commission, charging that the amendment to the zoning ordinance was an adjudicative act because it was aimed solely at them. Although the court acknowledged the plaintiffs were the "target" of the amendment, it denied that this established that the amendment was adjudicative rather than legislative, noting "[i]t is utterly commonplace for legislation to be incited by concern over one person or organization." *Id.* at 604. "Not the motive or stimulus, but the generality and consequences, of an enactment determine whether it is really legislation or really something else." *Id.* Where an enactment applies equally to all within its reach and operates prospectively, it is bona fide legislation. *Id.* at 605. The court held that the generality and prospectivity of the amendment indicated it was legislation, and therefore no notice or hearing was constitutionally required. *Id.*

These cases indicate Northwestern was not entitled to a hearing. Even if the Designation Ordinance was specifically targeted at the University, its generality and prospectivity suggest it was a legislative rather than an adjudicatory act. The generality of the Designation Ordinance is demonstrated by the inclusion of numerous property owners (some of whom objected to their

---

[21] The court did not reach the question of whether Pro-Eco was entitled to a hearing because the company admitted that it was aware of the public hearing scheduled to discuss and adopt the moratorium, that a representative of the company attended the meeting, and that the company's representative was not denied an opportunity to speak. *Id.* The court held that "[t]his was all 'that due process in zoning could possibly be thought to require.'" *Id.* (quoting *Coniston*, 844 F.2d at 469).

inclusion) other than Northwestern within the Final Local District. The prospectivity of the Designation Ordinance is obvious – by its terms, it regulates the future use of property within the Final Local District. Given its general nature and prospective application, the Designation Ordinance must be classified as generally applicable legislation, and thus Northwestern was not constitutionally entitled to a hearing before its adoption. Accordingly, the City is entitled to summary judgment on Count IV.

IV. Unconstitutional Conditions

In Count V, Northwestern alleges the City conditioned the exclusion of University property from the Final Local District on the University's agreement to waive the right under its Charter to be free from property taxation. Northwestern claims the City's demand that it waive a contractual right protected by the Constitution's Contracts Clause in exchange for a discretionary benefit (e.g., the University's exclusion from the Final Local District) amounts to a violation of the unconstitutional conditions doctrine. That doctrine prohibits the government from requiring that a person give up a constitutional right in exchange for a discretionary benefit conferred by the government. *See Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994). The doctrine "is premised on the notion that what a government cannot compel, it should not be able to coerce." *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984). Northwestern maintains that because the City could not directly compel the University's payment of property taxes, it should not be able to coerce such payments indirectly by conditioning exclusion from the historic district on payments to the City. We find there are genuine issues of material fact which preclude summary judgment on this count.

Northwestern alleges Alderman Drummer presented a proposal to Northwestern Vice President Sunshine which would have excluded some University property from the historic district in exchange for various monetary contributions to the City, including the return of certain University

property to the property-tax rolls. *See* Pl. SMF ¶ 231. Although the City denies that Drummer linked these contributions to exclusion from the historic district, *see* Def. Resp. to Pl. SMF ¶ 231, Sunshine's testimony to the contrary makes this a genuine issue of material fact. *See* Ex. 94 at ¶ 12.

If Drummer's proposal is as Northwestern claims, it represents the type of "out-and-out plan of extortion" which the unconstitutional conditions doctrine prohibits. *Nollan v. California Coastal Comm.*, 483 U.S. 825, 836 (1987). A local government simply cannot use its land-use powers to coerce individuals or entities to surrender constitutionally protected rights in furtherance of policies unrelated to land-use regulation. *See id.* at 837 ("the evident constitutional propriety disappears . . . if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition."). Drummer's proposal allegedly did just that – by conditioning Northwestern's exclusion from the historic district on the surrender of a property-tax exemption granted by the State and protected by the Contracts Clause, in furtherance of a policy designed to increase City revenues rather than to protect the architectural or residential nature of the local community, the proposal violates the unconstitutional conditions doctrine.

For municipal liability to attach in this case, however, Drummer must have been acting as a representative of the City in his negotiations with Sunshine. The City claims he was not, noting in particular Drummer's explicit denial. *See* Pl. Ex. 81 at 29-30. However, Drummer acknowledged in his deposition that he discussed the proposal with most of the members of the City Council. *See* Pl. SMF ¶ 243; Pl. Ex. 81 at 38-40. Drummer's discussions with fellow aldermen could allow a reasonable jury to conclude that he was acting as a representative of the City in subsequent negotiations with Sunshine. Accordingly, Northwestern has established genuine issues of material fact which preclude summary judgment on Count V.

## V. Freedom of Expression

In Count VI, Northwestern claims the City violated its First Amendment rights by enacting an historic district designed to freeze campus development and thus inhibit its expressive activities. We find the City is entitled to summary judgment on this count.[22]

Content-neutral regulations[23] which impose an indirect burden on expressive activities may pose First Amendment concerns. *See Univ. of Pa. v. Equal Employment Opportunity Comm.*, 493 U.S. 182, 200 (1990) (citing *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) and *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). In this case, however, Northwestern has failed to provide any evidence that the Designation Ordinance actually burdens expressive activity. On the 18.84 acres of University property included in the Final Local District, Northwestern and its faculty and students may still engage in expressive activity impeded only by the requirement that the University apply for a COA prior to modifying any of its structures. The University, however, has not yet even applied for a COA under the Designation Ordinance, and has offered no evidence to suggest why the mere application process itself burdens expressive activity.[24]

---

[22] The City contends that Northwestern lacks standing to pursue this claim because the University itself does not have First Amendment interests at stake; instead, the City maintains that the Designation Ordinance arguably threatens only the expressive activity of the University's faculty and students. Northwestern attempts to evade this objection by arguing that it deserves the same constitutional protections as bookstores, theaters, or cable television systems because it "acts as a conduit facilitating speech and related expressive activities of others." Mem. in Opp'n at 53 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) (adult theater); *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) (same); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) (cable system)). Because we find that the City is entitled to judgment as a matter of law on this count on other grounds, we need not resolve this issue.

[23] Northwestern acknowledges that the Designation Ordinance is not content-based. *See* Mem. in Opp'n at 55.

[24] Northwestern makes much of the City's alleged illicit motivation for the Final Local District – the desire to "freeze" campus development. The Supreme Court and the Seventh Circuit, however, have consistently denied the relevance of legislative motive in evaluating First Amendment challenges to content-neutral, generally-applicable laws affecting speech. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) (holding in First Amendment context that courts may not "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive"); *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir. 1999)

Even if Northwestern offered such evidence, we would find the alleged burden on expressive activity here too speculative and attenuated to state a claim for relief. *See Univ. of Pa.*, 493 U.S. at 200 (rejecting university's First Amendment claim as "speculative" and "attenuated"). Assuming that the COA requirement burdens expressive activity (in our opinion, an untenable assumption), any alleged injury is purely speculative absent a denial of a COA, and Northwestern has not yet even *applied* for a COA. Moreover, allowing this attenuated claim to proceed would threaten the City's efforts to enforce other generally applicable laws against the University. *See id.* As the Supreme Court has noted, "a university cannot claim a First Amendment violation simply because it may be subject to taxation or other government regulation." *Id.* at 200. Thus, even if the Designation Ordinance does have an incidental effect on Northwestern's expressive activity, the City has the right to enact generally applicable laws and to enforce them against the University. Accordingly, the City is entitled to summary judgment on Count VI.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment is granted with respect to Counts II, III, IV, and VI and denied with respect to Counts I and V.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated  9/11/02

("The actual motives of those who enacted the ordinance are irrelevant to our First Amendment analysis"); *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1290 (7th Cir. 1996) ("motive of a government body is irrelevant when it enacts a content-neutral rule that regulates speech in a nonpublic forum"). Evidence of the City's alleged illicit motives is therefore irrelevant to our judgment on this count.